## Pilsen Coal Company Appellee, v. West Chicago Park Commissioners, Appellant.

## Gen. No. 25,971.

1. SALES—*how contract construed as to deliveries.* A contract for delivery of all the screenings coal needed at defendant's power house during a certain term as ordered or directed by defendant, *held,* both from the language of the contract and from the practical construction placed thereon by the parties, to mean that plaintiff should, upon orders of defendant, make deliveries of coal from time to time as needed by defendant and that no unreasonable or very large amount of coal should be ordered at any one time.

2. SALES—*construction of provision as to right of purchaser to buy in open market on failure of seller to deliver.* A provision in a contract for the delivery of coal that if plaintiff should fail to deliver coal in such quantities or at such times as might be ordered by defendant, the latter might purchase coal in the open market and charge plaintiff with the difference between the then market price and the contract price and with all costs and expenses, *held* to mean that defendant could take such steps if plaintiff failed to deliver coal in such reasonable quantities and at such times as might be ordered and needed by defendant.

3. SALES—*construction of contract as to right of seller in certain contingencies to deliver coal from another source.* A provision in a contract for delivery of coal from certain sources that if there should be a "mine accident, railroad congestion, car shortage, or other causes," which in the opinion of plaintiff would make it impossible to deliver coal from the source named, plaintiff should notify defendant which, at its option, might permit plaintiff to deliver coal from another source equal in quality to that contracted for during a period not exceeding one week, which period might be extended from week to week at defendant's option, did not relieve plaintiff during a period of car shortage and railroad congestion from its obligation to deliver coal as needed by defendant at the contract price, nor oblige defendant to accept a proposition made by plaintiff to purchase a large quantity of coal of a different kind at a higher price in order to relieve the threatened shortage.

4. SALES—*when letter shows inability of seller to comply with contract.* A letter from plaintiff to defendant in regard to the delivery of screenings coal under a contract between the parties,

Pilsen Coal Co. v. West Chicago Park Com'rs, 221 Ill. App. 162.

*held* to amount to an acknowledgment of plaintiff's inability to continue to fulfill its contract and to authorize defendant to take plaintiff at its word and order coal from other parties and charge plaintiff with the difference in cost in accordance with provisions of the contract.

5. SALES—*right to purchase in open market on seller's acknowledgment of inability to perform.* The action of defendant in purchasing coal in the open market to supply its needs upon acknowledgment by plaintiff of its inability to supply coal in accordance with the contract between the parties, *held* reasonable and no justification for plaintiff's attempted cancellation of the entire contract.

MATCHETT, J., dissenting.

Appeal from the Circuit Court of Cook county; the Hon. CHARLES M. WALKER, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1920. Reversed and remanded. Opinion filed June 3, 1921. Rehearing denied June 17, 1921.

**Statement by the Court.** On March 6, 1917, plaintiff commenced an action in assumpsit in the circuit court of Cook county against defendant, to recover the sum of $1,959.58, together with interest thereon at 5 per cent per annum from January 1, 1917, for certain coal delivered to defendant during the month of December, 1916, under a written contract theretofore entered into between the parties. Plaintiff's declaration consisted of the common counts, with affidavit of claim, to which defendant filed a plea of the general issue, and notice of set-off claiming that, by reason of plaintiff's breach of said contract in failing to deliver certain coal, defendant was compelled to and did purchase coal in the open market and paid therefor the sum of $8,462.74 in excess of the contract price. On December 10, 1919, the jury returned a verdict, disallowing *in toto* defendant's claim of set-off, finding the issues in favor of plaintiff and assessing its damages at the sum of $2,253.52, the full amount of its claim including interest. The trial court, after overruling defendant's motion for a new trial, entered judgment upon the verdict against defendant and this

appeal followed. The case was tried upon a stipulation of facts, supplemented by other evidence.

. It appears from said stipulation of facts that the parties entered into a written contract, dated July 15, 1916 (after the defendant had advertised for bids), wherein it was provided, in substance, that plaintiff was to furnish defendant all the Pocahontas mine run coal, all the Pocahontas lump coal, and all screenings, "needed for consumption" in defendant's West Park system, located in the City of Chicago, from July 1, 1916, to June 30, 1917; that all the Pocahontas mine run and lump coal should come from a mine or mines located in McDowell county, West Virginia, and all screenings should come "from a mine or mines located in either the States of Illinois or Indiana"; that the coal should be furnished in accordance with certain specifications (a copy of which was attached to and made a part of the contract) and should be delivered at the places mentioned in the specifications, or at any other places directed by defendant; that all the coal delivered and accepted under the contract should be paid for monthly, the mine run coal at $4.40 per ton, the lump coal at $5.40 per ton, and the screenings at $2.15 per ton. In the specifications it was provided that the successful bidder would be expected to enter into a contract with the defendant whereby he should agree to furnish and deliver all coal of the grades specified "as ordered" by defendant; that the Illinois or Indiana screenings should be delivered to the main power house of the defendant in Garfield Park, Chicago; that the probable requirement of screenings at said power house would be 4,500 tons; that the bin capacity of said power house was 388 tons; and that deliveries of coal were to be made "as directed" by defendant. It is solely regarding the screenings to be delivered at said power house that the present litigation arises. In said specifications (paragraph F) it was further provided:

"PURCHASE OF FUEL ON THE OPEN MARKET."

"Should the contractor fail to deliver coal in such quantities, or any part thereof, or at such times as may be ordered by the West Chicago Park Commissioners hereunder, the West Chicago Park Commissioners may, at their option, declare the contract forfeited, either as to a portion of the same or the whole thereof, or the West Chicago Park Commissioners may purchase on the open market such an amount or amounts of coal as the said contractors shall fail to deliver, in which event all costs and expenses occasioned by such failure in excess of the cost hereunder of an equal amount of coal or corresponding grade shall be deemed a valid and subsisting claim against said contractor."

In said specifications (paragraph G) it was further provided:

"MINE ACCIDENTS, CAR SHORTAGE AND RAILROAD DELAYS."

"If at any time during the period covered by the contract there should be a mine accident, railroad congestion, car shortage, or other causes, which in the opinion of the contractor would make it impossible for him to deliver coal from the County and State named in his bid, it shall then be the duty of the contractor to notify the West Chicago Park Commissioners, in writing, who may at their option permit the contractor to deliver, for a period of not exceeding one week, coal equal in quality to that contracted for, and upon the written request of said contractor allow a further extension of not exceeding one week upon the conditions as aforesaid, and this permission to deliver from another source than contracted for, shall continue from week to week at the option of the West Chicago Park Commissioners as aforesaid."

It was further stipulated that, in compliance with said written contract, plaintiff delivered to defendant at various dates certain coal as specified in the contract; that on December 25, 1916, defendant was indebted to plaintiff for coal delivered in the sum of

$1,959.58; and that on December 26, 1916, the plaintiff, by its president, J. S. Curtin, wrote a letter to W. F. Grower, president of defendant, as follows:

"Referring to our several coal contracts with the West Chicago Park Board for Pocahontas lump coal at $5.40 delivered, mine run at $4.40 delivered, and Illinois or Indiana screenings at $2.15 delivered, we are finding some difficulty in performing our obligations under these contracts owing to the car shortages at the mines and the very great congestion at Chicago terminals, and we ask that some relief be afforded us, particularly the Garfield Park power house contract.

"We have been losing from two to three dollars a ton on the coal delivered at this point which we have heretofore billed as screenings. We suggest that you make an emergency purchase of 1,000 tons of mine-run coal at $4.40 to be delivered at once, and we think that this will insure the power house of having sufficient coal to tide them over the period of the greatest shortage.

"The coal trade is going through an experience that the oldest members thereof have never seen duplicated, and the car shortage and congestions are beyond the power of any coal man to control. All the larger industrial companies and railroads have bought emergency coal *outside of their contracts* and paid the market price therefor, and we trust that your body will see fit to do likewise, and aid us to complete this contract."

It was further stipulated that the above letter was received by Mr. Grower on December 26; that he on the same day presented the same to the defendant Commissioners in meeting assembled; that at said meeting the defendant Commissioners directed the secretary, Timothy Cruise, to make a demand in writing on plaintiff for the immediate delivery of 1,000 tons of Illinois or Indiana screenings; that said secretary, in the name of defendant, thereupon wrote plaintiff a special delivery letter, dated December 26 and mailed on December 27, as follows:

"We herewith make demand upon you for immmediate delivery of 1,000 tons of Illinois or Indiana screenings at $2.15 delivered at the power house at Garfield Park, Chicago, Illinois, in accordance with your contract of July 15, 1916, with us.

"You are hereby further notified that if you do not make delivery thereof at once we shall, in accordance with paragraph F of the specifications attached and made a part of said contract, purchase in the open market such amount of coal, or such part thereof as you may fail to deliver, and shall charge the excess of the cost thereof over $2.15 per ton delivered, and such expense as may be incurred in connection therewith, to you."

It was further stipulated that thereupon the defendant proceeded to purchase in the open market, at the then market price, certain quantities of coal *required* by it; that on December 27 it ordered 450 tons of screenings of the Consumers Company; that under said order it afterwards received said screenings at said power house at the cost of $6.50 per ton; and that on December 29 it received a letter from plaintiff, by said J. S. Curtin, its president, dated December 29, as follows:

"Referring to your communication of the 26th inst. in which you make demand upon us for 1,000 tons of Illinois or Indiana screenings to be delivered immediately to Garfield Park power house, this communication was received at our office in the Fisher Bldg. about 3 p. m. December 27th, by special delivery. Prior to the receipt of this letter the writer had talked to the chief engineer's office at the power house and informed him that there would be no deliveries that day, but the next morning we would proceed to deliver from 50 to 100 tons, and he stated that that would be satisfactory as they had sufficient coal to carry them until noon the following day. When the writer called up the power house the next morning he was informed that they had plenty of coal, and when asked where it was obtained from he was told that Consumers Com-

pany had received an order from you for 500 tons. of screenings at $6.50 per ton, on which order they had the previous afternoon delivered about 50 tons.

"In talking to Secretary Cruise on the 28th the writer was informed that such an order had been placed, and it was the intention of the West Park Board to charge up the difference between $2.15 per ton, our contract price, and $6.50 per ton, to the Pilsen Coal Company. We protested that this was not giving us a square deal. As stated in our letter of the 26th to W. F. Grower, President, the conditions in the coal trade and in the service rendered by the railroad companies has been extraordinary, and your demand for 1,000 tons of Illinois or Indiana screenings immediately is impossible of fulfillment by any coal company, *and is unreasonable.*

"Your further action in buying coal from the Consumers Company about 2 p. m. of the 27th without giving us any notification that you intended to do so, and your purpose to charge back loss to this company is so unjust *that we as a consequence declare these contracts with the Pilsen Coal Company cancelled.* We hereby demand immediate payment for all coal delivered up to date."

It was further stipulated that on January 3, 1917, the plaintiff received the following letter, dated January 3, from defendant, by said Cruise, its secretary:

"In reply to yours of the 29th we beg leave to advise that *we do not consent to your cancellation of the contracts with us,* and that we are still insisting that the contract is in force, and expect to hold you to the strict observance of all the conditions therein contained. We still want the coal for which we have heretofore made demand, and we want you to furnish it to us at the contract price. We also make demand upon you for all other coal called for by the contract in accordance with the terms thereof, and herewith notify you to deliver to us all coal called for by the contract, and that if you do not make such deliveries we shall purchase the same in open market and charge up the difference to you.

"We have already been obliged to obtain some coal in the open market and have been compelled to pay more than the price called for in your contract. We have not yet figured up that difference. We will do so immediately, however, and send you a statement as to the amount charged to us for the coal delivered to us by you in December, also the difference in the price upon the coal which we were compelled to buy in open market, on account of your failure to deliver, and the price called for by the contract. We believe that this statement will show a balance due us."

It was further stipulated that early in January, 1917, defendant mailed to plaintiff two orders for coal required for said month, one relative to the screenings required at the power house for said month, but that the orders were not filled; that subsequent to December 26, 1916, plaintiff did not deliver any coal under said contract; that defendant on and after December 26 and up to March 6, 1917, purchased in the open market the coal required by it under said contract; and that it paid for such coal the sum of $8,462.74, in excess of the price contracted for with plaintiff.

In addition to the stipulated facts, as above set forth, plaintiff introduced the testimony of two witnesses: J. S. Curtin, president of plaintiff, testified, in substance, that plaintiff in 1916 was engaged in the wholesale and retail coal business in Chicago, but not in the mining business; that it had two yards in Chicago; that, in fulfilling its contract with defendant, plaintiff had been accustomed to deliver screenings to said Garfield Park power house in lots of 100 to 150 tons at a time upon telephone orders received from the engineer of said power house; that on December 26, 1916 (the day plaintiff's letter of that date was written), it had on hand about 200 to 300 tons of screenings and mine run coal, either in its yards or on railway team tracks, which it intended to deliver to said power house, billing it to defendant as screenings; that on account of the coal shortage

170    Appellate Courts of Illinois.

Pilsen Coal Co. v. West Chicago Park Com'rs, 221 Ill. App. 162.

plaintiff, prior to said date and during said month of December, had been delivering mine run coal to said power house and calling it screenings and billing it to defendant as screenings at $2.15 per ton, and had been losing money on such coal; that mine run coal was a better grade of coal than screenings but could be used at said power house just as well as screenings; and that following a personal call made on Mr. Grower on December 26, he wrote the letter of that date to defendant at Mr. Grower's request. L. B. Steele, assistant sales manager of the Consumers Company, testified that on December 27 his company received an order from defendant for 450 tons of screenings to be delivered at the rate of 50 tons per day to Hamlin avenue and the Northwestern railroad tracks for use in said Garfield Park power house; and that in pursuance of said order about 10 tons were delivered at Hamlin avenue on December 27 and during the following four days 275 tons were there delivered.

On behalf of defendant, A. C. Schroder, superintendent of defendant for ten years, testified, in substance, that he had general supervision of all the work of the West Park System, including the Garfield Park power house; that said power house in 1916 heated the large conservatory, all of the eleven propagating houses, all of the work shops, stables and electric light substation; that said conservatory occupied a floor space of about an acre, was mostly composed of glass, and the interior of which was filled with various plants and flowers, a collection acquired through many years; that damage to plants and flowers begins as soon as there is a drop from the normal temperature; that if there was no heat in the conservatory for two hours, in the month of December, it would be destructive to the plants and flowers; that during the month of December in each year the average consumption of screenings coal in said power house was 26 tons a day, with a maxium of 40 tons

a day; that the average consumption during January in each year was 800 tons for the month; that necessity demanded that at least a ten days' supply of coal be kept in the bins; and that it was usual in December, 1916, for the engineer of the power house, or defendant's secretary, Mr. Cruise, to telephone to plaintiff almost daily defendant's coal requirements for a day or for several days.

W. F. Grower, president of defendant, in December, 1916, testified, in substance, that on December 26, 1916, J. S. Curtin, president of plaintiff, called upon him at defendant's offices in Union Park; that he then told Curtin that plaintiff should make larger deliveries of screenings to the power house, that defendant could not afford to take chances with only a few hours' supply on hand, that the contents of the conservatory were such that money could not replace them, and that on that very day defendant, because of plaintiff's failure to deliver coal, had been obliged to send its own teams to another park further west and bring to said power house sufficient coal to last a few hours; that Curtin replied, in substance, that, because of the then existing difficulty in getting coal owing to shortage of cars and railroad congestion, plaintiff could not then deliver any more screenings, that plaintiff had recently been delivering to said power house mine run coal at a loss and could not continue to deliver further coal except mine run coal and at the higher price of $4.40 per ton; that he (Grower) then suggested that Curtin on behalf of plaintiff write a letter to the park board, which Curtin on the same day did; that at said interview Curtin further said that plaintiff had not made arrangements at the mines early enough in the season to supply plaintiff's requirements for screenings and that on that account plaintiff was not able at the present time to get screenings.

Robert E. Gentzel and William R. Swissler, for appellant; William J. Corrigan, of counsel.

Rosenthal, Kurz & Houlihan, for appellee; James Rosenthal and Frank Michels, of counsel.

Mr. Justice Gridley delivered the opinion of the court.

Two of the grounds urged in defendant's motion for a new trial were that the finding of the jury was contrary to the weight of the evidence and contrary to law. The jury found the issues in favor of plaintiff and assessed its damages for the full amount of its claim including interest for coal delivered prior to December 26, 1916, under the contract between the parties, thereby disallowing *in toto* defendant's claim of set-off for damages occasioned by plaintiff's alleged breach of the contract in failing to deliver any screenings coal to the Garfield Park power house subsequent to said date. Two of the errors here assigned are that the trial court erred in denying defendant's motion for a new trial and in entering a judgment upon the verdict against defendant in the sum of $2,253.52. Counsel here argue in substance (1) that the evidence shows that there was a clear breach of the contract by plaintiff; (2) that because of such breach defendant, under the express provisions of paragraph F of the contract and under the law generally, was entitled to purchase screenings coal in the open market as it did, and to charge plaintiff with the difference between the then existing market price and the contract price; and (3) that, after the receipt by defendant of plaintiff's letter of December 26, 1916, and under conditions then existing at said power house and in the coal trade, the actions of defendant, in demanding that plaintiff immediately deliver 1,000 tons of screenings at said power house, followed by defendant's order to the Consumers Company to deliver 450 tons of screenings at said

power house, were not unreasonable, and did not constitute a breach of the contract by defendant which authorized plaintiff to cancel the same.

Referring to the contract in question we find that it was agreed that plaintiff should furnish to defendant during the year ending June 30, 1917, all the screenings coal "needed for consumption" at defendant's power house in Garfield Park at $2.15 per ton delivered; that the probable amount required at said power house for the year was 4,500 tons; that the bin capacity there was 388 tons; and that the coal should be delivered "as ordered" or "as directed" by defendant, and should be paid for monthly. It appears from the evidence that, during the time coal was furnished at the power house under the contract, plaintiff usually made deliveries in lots from 100 to 150 tons at a time upon telephone orders received from defendant's representatives. We think it clear, both from the language of the contract and the practical construction placed thereon by the parties, that the intention was that plaintiff should upon orders of defendant make deliveries of coal from time to time as such coal was needed by defendant, it to be the judge of that need, but that no unreasonable or very large amount of coal should be ordered at any one time. (*McLean County Coal Co. v. City of Bloomington*, 234 Ill. 90.) The specifications, on which plaintiff made its bid and which was made a part of the contract, also contained a provision (paragraph F) to the effect that should plaintiff fail to deliver coal, in such quantities or at such times as might be ordered by defendant, the latter might purchase coal in the open market and charge plaintiff with the difference between the then market price and the contract price and all costs and expenses. We think that this provision of the contract, in view of the other provisions thereof, should receive a like construction, viz.: that should plaintiff fail to deliver coal, in such *reasonable* quantities, and at such times, as might be

ordered and needed by defendant, the latter might purchase coal in the open market, etc.

The specifications contained the further provision (paragraph G) to the effect that, should there be a "mine accident, railroad congestion, car shortage or other causes" (the words "other causes" meaning, of course, other causes similar to those enumerated), which in the opinion of the plaintiff would make it impossible for plaintiff to deliver coal "from the county and state named in his bid," plaintiff should notify in writing defendant, who then at its option might permit plaintiff to deliver coal "from another source than contracted for" and "equal in quality to that contracted for," and for a period of not exceeding one week, which period might be extended from week to week at defendant's option. It was provided in the contract that all screenings coal should come "from a mine or mines located in either the States of Illinois or Indiana." It will be noticed that by the provision of said paragraph G, in case of the happening of the contingencies therein mentioned and notification in writing thereof given, defendant might allow delivery of screenings coming from another source than contracted for and equal in quality. It was not provided in said paragraph G or in any other part of the contract that, in case of the happening of any of said contingencies, plaintiff might be relieved from making further deliveries of screenings at said power house as needed by defendant, or might be allowed to charge a higher price than the contract price for such further deliveries during the continuance of a railroad congestion, car shortage or other similar occurrence. It further appears from the evidence, in substance, that during the month of December, 1916, and prior to December 26, plaintiff had been unable to make certain deliveries of *screenings* to defendant's power house, as needed by it, owing to "car shortage at the mines and very great congestion at Chicago ter-

minals," and further owing to the fact, as Grower testified Curtin told him, that plaintiff had not made arrangements at the mines sufficiently early in the season to supply plaintiff's requirements for screenings; that frequently during said period plaintiff, in order to fill defendant's orders, had delivered *mine run* coal (a higher and more expensive grade of coal, but which could be used at the power house), billing it at the contract price of screenings, and as a consequence had been losing money; that on December 26, plaintiff had on hand in its two Chicago yards and on railroad team tracks only from 200 to 300 tons of screenings and mine run; that on said date defendant's supply of coal at the power house was very low and defendant's representatives had become disturbed over the situation; that it was winter time and said power house furnished the heat for a large conservatory, mostly composed of glass, where a valuable collection of plants and flowers was housed; that the average consumption of coal at the power house during the month of December was 26 tons a day with a maximum of 40 tons, and that the average consumption for the month of January in each year was 800 tons; and that in the opinion of defendant's superintendant necessity demanded that at least a ten days' supply of coal, or more, be kept in the bins. With this condition of affairs existing plaintiff wrote the letter of December 26 to defendant, in which was mentioned the "difficulty" it had had in performing its "obligations" under the contract relative to the delivery of screenings at the power house owing to car shortage and railway congestion, and also the fact that it had recently been losing money on its contract because it had been furnishing mine run coal and billing it at the contract price of screenings. In the letter plaintiff proposed that defendant, *outside* of the contract, make "an emergency purchase" of *1,000* tons of mine run coal to be delivered *at once,* in order to tide defendant

176    APPELLATE COURTS OF ILLINOIS.

Pilsen Coal Co. v. West Chicago Park Com'rs, 221 Ill. App. 162.

over during the period of greatest shortage, and that defendant pay therefor the sum of $4.40 per ton; in other words, plaintiff suggested that, because of existing car shortage and railroad congestion, defendant temporarily relieve plaintiff of its obligation under the contract to deliver screenings at the power house at $2.15 per ton, make a large purchase of a higher grade of coal than needed at the power house and pay a higher price. Under the law, notwithstanding the then existing car shortage and railroad congestion which had not been provided against except to the very limited extent as above noted, plaintiff was bound to carry out its contract and deliver coal as needed at the power house at $2.15 per ton delivered, and defendant was under no legal obligation to accept plaintiff's proposition. And clearly under the facts disclosed immediate deliveries of coal were needed then at the power house. In 35 Cyc. 244, it is said:

"The general rule that no impossibility arising subsequent to the making of the contract will excuse the performance thereof is of course applicable to the contract of sale; and a seller who promises unconditionally to deliver takes the risk of being unable to perform, although his inability is caused by inevitable accident, or circumstances beyond his control."

This is substantially the rule in this State, as disclosed from many decisions. In *Bunn v. Prather*, 21 Ill. 217, 218, it is said:

"When a party, *by his own contract*, engages to do an act, it is deemed his own fault and folly that he did not thereby expressly provide against contingencies, and exempt himself from responsibility in certain events; and in such case, therefore, that is, in the instance of an absolute and general contract, the performance is not excused by an inevitable accident, or other contingency, although not foreseen, by or within the control of the party."

In *Bacon v. Cobb*, 45 Ill. 47, 52, it is said:

"The rule, from the earliest times to the present,

is, when a party by his own contract creates a duty
or charge upon himself, he is bound to make it good,
notwithstanding any accident by inevitable necessity,
because he might have provided against it by his con-
tract.''

In *Dehler v. Held,* 50 Ill. 491, 493, it is said:

"As a general rule, where a party binds himself
to perform an act, he is held to its performance, ex-
cept where it is rendered impossible by the act of God
or the public enemy. The mere fact that it may be
inconvenient, or attended with loss, is no excuse.''

In *Steele v. Buck,* 61 Ill. 343, 347, it is said:

"The rule is a just one, and has its foundation in
reason, for, if he did not intend to bear the loss, it is
natural to presume that he would have stipulated
against it. It tends to promote justice by regarding
the sanctity of contracts. In some instances it may
work a hardship; so do all general rules; but they
are none the less indispensable in the affairs of life
for that reason.''

In *Irwin v. Kelly,* 176 Ill. App. 178, 181, which was
an action for damages against defendants for failure
to deliver certain coal as they had contracted to do
and there was a shortage of cars, the Appellate Court
for this district held that such shortage was no defense
in such an action, the contingency not having been
provided against in the contract.

It further appears from the evidence that plaintiff's
said letter of December 26 was received by defendant
and read at a meeting of the defendant Commissioners
on the same day, that plaintiff's proposition was not
accepted, and that defendant caused to be written its
letter of the same date, but mailed on December 27,
in which it made demand upon plaintiff for the im-
mediate delivery of 1,000 tons of screenings coal at the
power house at the contract price of $2.15 per ton,
and notified plaintiff that if it did not make such
delivery defendant, under paragraph F of the specifi-
cations, would purchase coal in the open market, etc.

This letter was received by plaintiff in the afternoon of December 27, and later in the afternoon of that day defendant, being greatly in need of coal at the power house, placed an order with the Consumers Company for 450 tons of screenings to be delivered at the rate of 50 tons per day at the then market price of $6.50 per ton. On December 29, defendant received plaintiff's letter of that date, in which plaintiff took the position, in substance, and so advised defendant, that the latter's action in making demand on December 26 for the immediate delivery of 1,000 tons of screenings under then existing conditions was unreasonable, and that defendant's further action in purchasing coal from the Consumers Company at $6.50 per ton, with intent to charge plaintiff with the difference, was so unjust that as a consequence plaintiff declared the contract in question canceled. On January 3, 1917, defendant wrote plaintiff, refusing to consent to the cancellation of the contract, saying that defendant still wanted coal furnished by plaintiff at the contract price and making further demand therefor; and early in that month defendant mailed orders to plaintiff for coal needed at the power house and elsewhere under the contract for the month of January, but the orders were not filled by plaintiff and no further coal was furnished by plaintiff.

We think that a careful reading of plaintiff's letter of December 26 to defendant discloses that it is an acknowledgment by plaintiff of its inability to continue to fulfill its contract with defendant, so far as concerned the delivery of screenings at the power house, and that plaintiff would be compelled to breach that portion of its contract unless defendant was willing to consent to certain suggested modifications. This being so, defendant had the right to take plaintiff at its word and act accordingly. (*Follansbee v. Adams,* 86 Ill. 13, 15.) Under paragraph F of the specifications, if plaintiff could not or would not deliver screenings,

as needed, defendant had the clear right, under said paragraph and under the law (*Sleuter v. Wallbaum*, 45 Ill. 43, 45), to purchase a reasonable amount of screenings coal in the open market to meet its needs and to charge plaintiff with the difference between the then existing market price and the contract price. It is contended by counsel for plaintiff that defendant's demand upon plaintiff, shortly after the receipt of plaintiff's said letter, for the immediate delivery of 1,000 tons of *screenings* coal was an unreasonable one under conditions then existing, but it may be said in passing that it evidently did not seem unreasonable to plaintiff to suggest to defendant that the latter make an "emergency purchase" of the same amount of *mine run* coal to be delivered "at once," and at a price of $2.25 per ton more than the contract price for screenings. Defendant, however, did not make a purchase of 1,000 tons of screenings in the open market but only 450 tons to be delivered at the rate of 50 tons per day. We think that the actions of defendant, under the provisions of the contract and under the conditions then existing at its power house, were reasonable. (*McLean County Coal Co. v. City of Bloomington*, 234 Ill. 90, 100.) These actions of defendant were not, in our opinion, any justification for plaintiff's attempted cancellation of the entire contract, as stated in its letter of December 29. That letter shows that before it was written plaintiff had been fully advised of the actions taken by defendant in purchasing a reasonable amount of coal in the open market to meet its pressing needs. Apparently plaintiff was desirous, if possible, of being relieved from the obligations of its contract to deliver coal to defendant at the contract prices because of existing conditions, and seized upon defendant's said letter of demand as a pretext to possibly bring about that result.

Our conclusion is that the verdict of the jury was contrary to the weight of the evidence and contrary

to the law, that the court erred in refusing to grant defendant's motion for a new trial and in entering the judgment appealed from, and that the cause should be remanded for a further trial.

*Reversed and remanded.*

BARNES, P. J., concurs.

MATCHETT, J., dissenting.